IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

MICHAEL ANTHONY KING                                            PLAINTIFF

v.                                    CIVIL ACTION NO. 2:11CV00016-WAP-JMV

W. W. GRAINGER, INC.                                           DEFENDANT

## REPORT AND RECOMMENDATION

This matter is before the court in this Title VII sex discrimination case on the defendant's Motion for Summary Judgment (Doc. 139) and the pro se plaintiff's Corrected Motion for Partial Summary Judgment (Doc. 147). The matter has been assigned to the undersigned United States Magistrate Judge for issuance of a report and recommendation. Having thoroughly considered the submissions of the parties, the record and the applicable law, it is recommended that the defendant's Motion for Summary Judgment be granted and that the plaintiff's Corrected Motion for Partial Summary Judgment be denied for the reasons that follow.

## I. Introduction

This case arises from the termination of Michael King's employment after he, according to his employer, Grainger, failed to perform his assigned, regular job duties for an extended period of time while being paid at an overtime rate. King, who is proceeding pro se, initially alleged a variety of claims arising from his termination, but the only remaining one is "sex discrimination leading to termination." (Doc. 69.) As explained in detail below, because King's proof fails to create a genuine issue as to whether females, who were engaged in employment duties and conduct nearly identical to his own, were treated more favorably by the same supervisor or decision maker, Grainger is entitled to summary judgment.

## II. Facts

On the Saturday, June 20, 2009, in order to catch up on what King himself acknowledges was a serious back log in the inbound department where he was regularly employed, Grainger scheduled members of the inbound team– as well as volunteers from another department– to assist with inbound put-away functions. (Michael King Dep. at 123; Rob Reynolds Decl. Ex. A; Artemio Reyna Decl. Ex D.) It is undisputed that the subject of the backlog in the inbound department had recently been the topic of much discussion between management and the inbound department employees, specifically including King, who had addressed the situation one-on-one with management, just several days prior to the scheduled Saturday overtime work. It was management's expressed belief that the backlog was due to inefficient use of work time– namely, loafing during scheduled work periods rather than scanning and putting items away promptly. On the Saturday in question, some employees were scheduled to commence their work at 6:00 a.m., others at 7:00 a.m., with the final group beginning at 8:00 a.m. (King Dep. at 120, 123-125; Reyna Decl. Ex. D; Kenneth Vinson Decl. Ex. E.) King arrived at Grainger to begin his scheduled shift at 8:00 a.m. (King Dep. at 120; Reyna Decl. Ex. D; Vinson Decl. Ex. E.) Following his arrival, King attended a brief start-up meeting with his supervisor, Ken Vinson, and reported to the bins area at approximately 8:05 a.m. (King Dep. at 121; Reyna Decl. Ex. D; Vinson Decl. Ex. E.) At the meeting with his supervisor, King was informed that volunteer members from another department, Carolyn Lake and Sheena Ward, were assisting, and at the time of King's start, had already been putting product away since approximately 6:30 am. (King Dep. at 121; Reyna Decl. Ex. D; Vinson Decl. Ex. E.) As with other of the regular inbound warehouse workers on that day, King was asked to check on the volunteer warehouse

2

associates and answer their questions. (King Dep. at 121; Reyna Decl. Ex. D; Vinson Decl. Ex. E; Statement of Vinson, attachment C-14 to Ezell Bell Decl. Ex. C.) According to Grainger, King was also expected to report immediately to the warehouse bins work area and promptly begin scanning and putting away product. (Reyna Decl. Ex. D; Vinson Decl. Ex. E.)

After arriving in the bins area, however, King did not commence any put-away activities. (King Dep. at 128-29; Reyna Decl. Ex. D; Vinson Decl. Ex. E.) King admits that he did not scan his first product to put away for approximately one and one-half hours after clocking in. (King Dep. at 128-30.) Instead, Grainger officials contend he engaged in social conversation with other employees who were on break or involved in work activities of their own at the time. (Reyna Decl. Ex. D; Bell Decl. Ex. C; Vinson Decl. Ex. E.) In addition, King was observed on surveillance camera sitting on an operational conveyor belt system in violation of Grainger's safety rules. (Reyna Decl. Ex. D; Bell Decl. Ex. C; Vinson Decl. Ex. E.) King maintains, on the other hand, that though he admittedly put no product away, "for an hour and a half [he] assisted Lake and Ward (the volunteers from another department) in the new bin module procedure." (King Dep. at 129.) More recently, King contends that he did not put product away for the first approximate one hour of his shift because there was none to put away and that for the next approximate half hour he was moving from the floor where put up duties were being performed by other employees to the check in dock and that in the process he was gathering items to "set up" the check in dock. (Pl.'s Resp. to Def's Mot. Summ. J. ) Grainger insists its investigation revealed otherwise. (Reynolds Decl. Ex. A; Reyna Decl. Ex. D.) Grainger's video surveillance showed King, for the first approximate hour after he clocked into work and had received an initial five minutes of instructions, engaging in conversation either with employees on break or

3

walking alongside employees as they performed their put-away functions. (Reyna Decl. Ex. D; Bell Decl. Ex. C.) Grainger asserts that the video surveillance confirmed the presence of pallets of items to be put away, and this was documented in the business documents of Grainger. Additionally, with respect to King's assertion that he was needed to instruct the volunteer employees, Ward and Lake, during this one hour period, Grainger asserts that Ward and Lake had already been trained for approximately thirty minutes at the inception of their 6:00 a.m. shift and had been able to perform their put-away tasks without further training for well over an hour before King even reported for his 8:00 a.m. shift. According to the business records for the day in question (records offered both by King and by Grainger), King is recorded on video as follows:

> On Saturday June 20, 2009, Michael King was observed on the 3rd level of the bin module by the security cameras:
>
> 1. Performance/Productivity - not performing his putaway functions.
>
> 2. Safety (Imminant [sic] Danger) Documentation ID# EHS0102 - Observed via camera "sitting and/or leaning on powered conveyor systems-whether the power is on or off."
>
> 3. Stealing Time - Michael clocked in at 8 a.m. - he was viewed by the camera not performing his put away functions because he was socialing [sic] and not being productive. This is considered as stealing time. Note: Michael's first transaction was captured at 9:26 a.m. on the Elizabeth report.

(Employee Corrective Action Notice Dated 6/22/09 attached as Ex. to Pl.'s Resp. to Def.'s Mot. Summ. J.)

King asserts gender discrimination because the two volunteer employees, Lake and Ward, both females, were also captured on the surveillance tape loafing and leaning against the conveyor, but they were not fired. Grainger concedes the two females were not fired, but it

4

contends that they were merely volunteers in the inbound department that day, and, like their male co-employee, Terry Mason– who was similarly seen loafing that morning but who was not ultimately terminated– they only briefly disregarded their duties (for approximately 20 minutes) (Reynolds Decl. Ex. A; Reyna Decl. Ex D.)

In this regard, the record reveals that Ward, Lake and Mason were all scheduled to begin their ten minute break at 8:00 a.m. (King Dep. at 124-25.), but all three started their breaks approximately ten minutes prior to 8:00 a.m. and began performing their put-away functions approximately ten minutes after their expected 8:10 a.m. return time. (Reynolds Decl. Ex. A; Bell Decl. Ex C; Reyna Decl. Ex. D.) As a result of their actions, all three individuals were ultimately counseled and given warnings regarding their taking extended break time. (Reynolds Decl. Ex. A; Bell Decl. Ex C; Reyna Decl. Ex. D.) Specifically, Terry Mason ultimately received a verbal warning for taking unauthorized time on either side of his break. (Final Corrective Action Notice dated 7/17/09 and Review Documents, attachment C-11 to Bell Decl. Ex. C.) An initial decision to terminate Mason's employment was made by the Inbound Operations Manager, Artemio Reyna, with the approval of Rob Reynolds. (Reyna Decl. Ex. D; Vinson Decl. Ex. E; Reynolds Decl. Ex. A; Bell Decl. Ex. C.) After review, it was determined that Mason should be reinstated and receive a verbal warning for his conduct on the day in question. (Reyna Decl. Ex. D; Vinson Decl. Ex. E; Reynolds Decl. Ex. A; Bell Decl. Ex. C.) The final Corrective Action Notice dated July 17, 2009, states: "On Saturday, June 20, 2009, you were observed by security leaving your work area and participating in unproductive time with other associates for 20 minutes. This was not an authorized break." (Final Corrective Action

5

Notice dated 7/17/09, and Review Documents, attachment C-11 to Bell Decl. Ex. C.)[1]

Lake and Ward ultimately received a written warning for their conduct on June 20, 2009. (Corrective Action Notice dated 7/6/09, and Review Documents of Sheena Ward and Carolyn Lake, attachments C-12 and C-13 to Bell Decl. Ex. C.) The initial decision to discipline Sheena Ward and Carolyn Lake was made by the Outbound Process Manager, James Phillips, and Outbound Operations Manager, Kenny Overman (Ward and Lake's regular supervisors from another department), with the approval of Rob Reynolds. (Bell Decl. Ex. C; Kenny Overman Decl. Ex. G.) Lake and Ward's Corrective Action Notice states as follows:

> . . . You are being issued a final warning for unsafe violations while working on Saturday, June 20, 2009. During this time, you were observed on the third floor of the bin module sitting on a conveyor. Furthermore, while you admitted to taking a break upstairs for 10 minutes, you were witnessed standing around for 20 minutes while there was work to do. Understand that at no time, while operating or not, are you allowed to sit on the conveyor for any reason and your time on task before and after breaks are crucial. Long breaks before or after breaks or lunches can be viewed as time theft. This step will remain in effect for one year through June 20, 2010.

(Final Corrective Action Notice dated 7/17/09 and Review Documents, attachment C-12 and C-13 to Bell Decl. Ex. C.) Lake and Ward requested a review of their manager's corrective action. (Overman Decl. Ex. G.) It was determined that Lake and Ward did not actually sit on the conveyor belt, but were sitting on a pallet of boxes and leaning on the conveyor belt. (Overman Decl. Ex. G; Reynolds Decl. Ex. A.)

---

[1] King claims that the decision to reinstate Terry Mason's employment after review is "false." He asserts that Terry Mason "was one of the random people that W. W. Grainger called and rehired when they begun [sic] restaffing [sic]." King offers no evidentiary support for this contention, and he cannot create issues of fact by unsupported and conclusory claim that the actual proof offered in support of Grainger's contention is "false."

### III. Summary Judgment Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues of material fact and that the moving party is entitled to judgment as matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Toplalian v. Ehrman*, 945 F.2d 1125, 1131 (5th Cir. 1992). "To avoid summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case; naked assertions of an actual dispute will not suffice." *In re Lewisville Properties, Inc.*, 849 F.2d 946, 950 (5th Cir. 1988) *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-556, 106 S. Ct. 2505, 2510-11, 91 L. Ed. 2d 202 (1986). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material and must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Oglesbee v. Nat'l Sec. Fire & Cas.*, 788 F. Supp. 909, 913 (S.D. Miss. 1992). "In an employment discrimination case, the Court must focus on whether a genuine issue exists as to whether the defendant intentionally discriminated against the plaintiff." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 4444, 447-48 (5th Cir.1996). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Burfield v. Brown, Moore, & Flint, Inc.*, 51 F.3d 583, 588 (5th Cir. 1995). "When the moving party has carried his burden under Rule 56(c), his opponent must present more than a metaphysical doubt about the material facts." *Id.* In reviewing a motion for summary judgment, "the judge must ask

himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

A plaintiff's mere beliefs, conclusory allegations, speculation, or unsubstantiated assertions that his employment was terminated as a result of illegal discrimination are insufficient to survive summary judgment. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996). If a plaintiff lacks evidence sufficient to create a genuine issue of fact in support of a necessary element of a claim or claims, then summary judgment is appropriate against plaintiff on that claim. *Hypes v. First Commerce Corp.*, 134 F.3d 721, 725 (5th Cir. 1998). In responding to Grainger's motion, King is required to produce "significant probative evidence" to support his claims of gender discrimination. *First National Bank of Commerce v. Monaco Agency, Inc.*, 911 F.2d 1053, 1057 (5th Cir.1990)("A mere scintilla of evidence in support of the plaintiff's complaint is insufficient to survive summary judgment.").

## IV. Analysis

A. Grainger's Motion For Summary Judgment

King has not presented any direct evidence of unlawful discrimination, so the Court must analyze his case for discrimination under the burden-shifting test enunciated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "[T]o succeed on a claim of intentional discrimination under Title VII . . . a plaintiff must first prove a prima facie case of discrimination." *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996). In this case, King, in order to establish a prima facie case of

8

gender discrimination, must prove: "(1) that he is a member of a protected class; (2) that he was at all times qualified for his position; (3) that he suffered an adverse employment action; and (4) that others similarly situated, but outside the protected class, were treated more favorably." *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *Sreeram v. L.S.U. Med. Center-Shreveport*, 188 F.3d 314, 318 (5th Cir. 1999); *Willis v. Coca Cola Enterprises Inc*., 445 F.3d 413, 420 (5th Cir. 2006), *citing Rutherford v. Harris Co., Tex.,* 197 F.3d 173, 184 (5th Cir. 1999). Whether two employees are "similarly situated" for purposes of a Title VII discrimination claim turns not on whether their situations are "similar" but instead on whether they are "nearly identical." *Atterberry v. City of Laurel*, 401 Fed. Appx. 869, 2010 WL 4561339, *2 (5th Cir. Nov. 10, 2010), *citing Williams v. Trader Publ'g Co.,* 218 F.3d 481, 484 (5th Cir. 2000); *Smith v. Wal- Mart Stores,* 891 F.2d 1177, 1180 (5th Cir. 1990) (per curiam); *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1090 (5th Cir. 1995).

The key inquiry here is whether King can establish that he was treated differently than female employees under "nearly identical" circumstances. *Mayberry*, 55 F.3d at 1090. The existence of a "true comparator" may only be established by King if: (1) he can identify other employees; (2) who are not members of protected classes; and (3) who were shown preferential treatment; (4) after they engaged in "nearly identical" conduct; (5) which was considered and reviewed in "nearly identical circumstances;" (6) by the same supervisors and decision makers. *See Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001); *Little v. Republic Refining Co., Ltd,* 924 F.2d 93, 97 (5th Cir. 1991).

King attempts to compare his conduct on June 20, 2009, to that of Lake and Ward, the two employees who volunteered from another department to assist inbound that day. Lake and

Ward (and a male, Terry Mason) received warnings for taking an extended break of approximately 20 minutes on June 20. On the other hand, King's conduct was more egregious in that he admittedly failed to process any product for well over an hour after clocking in; had the benefit of prior one-on-one discussions just days before regarding the importance of productivity and time on task by Grainger management; and was regularly employed in the inbound department. Lake and Ward, on the other hand, worked regularly in another department; were volunteers to the inbound area; and did not have the benefit of any prior one-on-one counseling about time usage in the inbound department. Furthermore, they loafed for a substantially lesser period of time (and only after having worked a significant period following clocking in), and were disciplined by a different department head.

The comparative employees must be "nearly identical" in all the relevant aspects of their employment and their workplace conduct. *Wallace v. Methodist Hospital System*, 271 F.3d 212, 221 (5th Cir. 2001). The plaintiff does not sustain [his] burden, either to demonstrate a prima facie case or to show pretext, "when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *See id* at 221. Courts look to the gravity of the alleged comparator's conduct in finding that the circumstances were not nearly identical to create an inference of discrimination. *Hernandez v. Sikorsky Support Servs.*, 2011 U.S. Dist. LEXIS 125180 (S.D. Tex. Oct. 28, 2011) (district court granted summary judgment noting that the alleged comparator's mistake was less serious than the plaintiff employee's "failure to complete her assigned work for a period of several months."); *Fuqua v. Wal-Mart Stores East, L.P.*, 2011 U.S. Dist. LEXIS 60766 (N.D. Miss. June 7, 2011) (the court found that the defendant could not meet her prima facie case of

gender discrimination because the conduct of the male employee was not "nearly identical" because while both employees took out advances on their paychecks, the male employee paid his back.).

In *Miller v. North Miss. Med. Clinics, Inc.,* 2011 U.S. Dist. LEXIS 47112, 10-11 (N.D. Miss. May 2, 2011) *affirmed* 2011 U.S. App. LEXIS 20234 (5th Cir. Oct. 4, 2011), the court granted summary judgment on the plaintiff's claim of gender discrimination. The plaintiff physician was terminated after she engaged in inappropriate conduct in the workplace, including discussing her marital problems with patients at the medical clinic. *Id.* The plaintiff claimed that
because her employer did not also terminate her husband who had also engaged in disruptive and inappropriate workplace conduct, her termination was discriminatory. *Id.* However, this Court looked to each employee's conduct and found that the plaintiff's conduct was more severe and disruptive, making the discipline of both employees not comparable. *Id.* at *10-11. This Court found that the plaintiff could not meet her prima facie case of discrimination because "even if the Court were to find that Plaintiff and [her husband] were similarly situated in employment status, the incidents engaged in were not "nearly identical." *Id.*

In the current case, Lake and Ward's conduct (and Mason's– a male– for that matter) of taking an extended break is not nearly identical to King's failure to perform his assigned job duties for over an hour after one-on-one discussion of this issue with management just three days earlier. In his response, King attempts to meet the "nearly identical" standard by alleging that Ward and Lake actually shirked their duties for as long or longer than he did. There are several problems with this assertion. First, King has presented no proof to this effect. To the contrary,

11

the record reveals that after a brief initial training session prior to commencing put-away activities, Lake and Ward consistently put items away until approximately ten minutes prior to their scheduled 8:00 a.m. break and began putting items away again approximately ten minutes after their break ended at 8:10 a.m. Secondly, this assertion flies in the face of another of King's assertions that from 8:05 a.m. until he reported to the pick up area until well after 9:00 a.m., he was actively engaged in assisting Ward and Lake in performing their put-away functions.[2] In short, there is no proof offered by King to support his assertion that Lake and Ward, the volunteers, were shirking their duties for the extended period that he was captured on video doing so.

Moreover, the decision to discipline was not made by the same supervisor. In *Suggs v. Lowndes County Sch. Dist.,* 2011 U.S. Dist. LEXIS 39270, *14 (N.D. Miss. Apr. 11, 2011), the plaintiff employee was terminated after he was accused of using excessive force. The plaintiff brought suit, claiming that his termination was discriminatory because an assistant principal, who was accused of using excessive force, was not also terminated. In *Suggs*, this Court quoted *Lee v. Kansas City South Railway. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009), to show the demanding standard used by the courts of the Fifth Circuit to show disparate impact by a comparator:

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too

---

[2] In his reply to Grainger's Motion for Summary Judgment, King concedes not putting product away for this extended period, but he argues that he failed to do so because there was no product to put away. The court notes that this assertion contradicts King's claim that he, during all of the disputed time, actively assisted Lake and Ward in connection with their putting product away. If there was no product to put away, there was obviously no need to assist in putting it away.

12

> remote in time from that taken against the plaintiff generally will not be
> deemed similarly situated. Likewise, employees who have different work
> responsibilities or who are subjected to adverse employment action for
> dissimilar violations are not similarly situated. This is because we require
> that an employee who proffers a fellow employee as a comparator
> demonstrate that the employment actions at issue were taken "under nearly
> identical circumstances." The employment actions being compared will be
> deemed to have been taken under nearly identical circumstances when the
> employees being compared held the same job or responsibilities, shared the
> same supervisor or had their employment status determined by the same
> person, and have essentially comparable violation histories. And, critically,
> the plaintiff's conduct that drew the adverse employment decision must
> have been "nearly identical" to that of the proffered comparator who
> allegedly drew dissimilar employment decisions.

*Id.* at 14 (citations omitted). The *Suggs* court granted the defendant's summary judgment, finding that there was no inference of discrimination because the alleged comparator worked in a different district and was supervised by a different individual. *Id.* In the current case, Lake and Ward were not regularly employed in King's department, and they had a different manager than King. Lake and Ward's managers, James Phillips and Kenny Overman, determined their conduct warranted a particular discipline. (Overman Decl. Ex. G.) Art Reyna, Inbound Operations Manager, with the approval of Rob Reynolds, made the determination that King's conduct warranted another discipline. (Reyna Decl. Ex. D; Vinson Decl. Ex. E.) As in *Suggs*, because Lake and Ward were from a different department and supervised by different individuals, their discipline does not raise an inference of discrimination. King was not similarly situated to Lake or Ward, and the circumstances involving each were not nearly identical. Furthermore, though King points to the timing and technique used by Lake and Ward's supervisor in disciplining them in an attempt to show that they were treated more favorably, this only highlights that different supervisors were making the discipline decisions involving conduct that differed from that of King.

13

In short, because King has offered no proof, other than self serving proclamations, to support his contention that Ward and Lake's employment circumstances were nearly identical to his, he has failed to make out a prima facie case of discrimination, and it is recommended that Grainger's Motion for Summary Judgment be granted and that this case be dismissed with prejudice.

B. King's Corrected Motion for Partial Summary Judgment

The deadline set by this Court for filing all dispositive motions was November 24, 2011. And, on December 8, 2011, this Court denied King's Motion to Extend. King did not file his "Corrected" Motion for Partial Summary Judgment (Doc. 147) until December 1, 2011, well after the deadline and without leave of court. *Maxey v. General Motors Corp.*, No. 3:95CV60-D-A, 1996 WL 692222 (N.D. Miss. Nov. 18, 1996) (judge has discretion to deny a motion that is untimely). Thus, it should be stricken. Further, the "Corrected" Motion for Partial Summary Judgment is not in compliance with the *Federal Rules of Civil Procedure* because it was filed in violation of L. U. Civ. R. 7(b).

Furthermore, the Court has on multiple occasions admonished King that he must follow the rules, and in particular, the scheduling deadlines imposed by the Court. (Doc. 107; 124, n. 3; and 137) King's filing of this "Corrected" Motion for Partial Summary Judgment out of time and without leave of court shows a pattern of disregard for the rules and orders of this Court. It is, therefore, recommended that the "Corrected" Motion for Partial Summary Judgment and attached evidence be stricken.

The parties are referred to L. U. Civ. R. 72(a)(3) for the applicable procedure in the event any party desires to file objections to the findings and recommendations herein contained. The

parties are warned that any such objections are required to be in writing and must be filed within fourteen (14) days of this date. Failure to timely file written objections to the proposed findings, conclusions and recommendations contained in this report will bar an aggrieved party, except upon grounds of plain error, from attacking on appeal unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Respectfully submitted, this 26th day of January, 2012.

/s/Jane M. Virden
UNITED STATES MAGISTRATE JUDGE